ATTORNEY GENERAL vs. COMMISSIONER OF INSURANCE
& another.[1]

Suffolk. September 5, 2007. - January 3, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & CORDY, JJ.

*Massachusetts Property Insurance Underwriting Fund. Practice, Civil,* Review
of decision of Commissioner of Insurance. *Insurance,* Commissioner of
Insurance, Rate setting, Homeowner's insurance. *Administrative Law,*
Judicial review, Substantial evidence, Rate setting, Agency's interpretation
of statute.

Discussion of the statutory framework for the approval by the Commissioner
of Insurance of rate filings of the Massachusetts Property Insurance
Underwriting Association, which operates the residual market for property
and casualty insurance with the goal of providing basic property insurance
to eligible participants who are otherwise unable to obtain insurance in the
voluntary market. [313-315]
In considering the reasonableness of rates for basic property and casualty
insurance proposed by the Massachusetts Property Insurance Underwriting
Association (MPIUA), the Commissioner of Insurance (commissioner)
properly interpreted the language of G. L. c. 175, § 5 (*c*), as authorizing
her to approve, in her discretion, certain proposed rates that exceeded the
statutory cap contained therein, based on her consideration of certain
specified factors [318-322]; further, G. L. c. 175, § 5 (*b*), did not require
the commissioner, in approving the rates proposed by MPIUA, either to
explicitly consider or to make express findings concerning the loss experi-
ence of insurers in the relevant market [322-323], and substantial evidence
supported the commissioner's decision to approve MPIUA's use of computer
generated models to estimate projected losses due to hurricanes [323-325].
In an action seeking review of the approval by the Commissioner of Insurance
(commissioner) of a revised rate filing by the Massachusetts Property
Insurance Underwriting Association, the Attorney General failed to
demonstrate that she was entitled, in the circumstances, to notice, a hear-
ing, and a right to cross-examine witnesses on the revised filing before the
commissioner approved it. [325-326]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on September 8, 2006.

[1]The defendant intervener, Massachusetts Property Insurance Underwriting
Association (MPIUA), which is an association that, pursuant to G. L. c. 175C,
operates and manages the Massachusetts residual market. See *Hudson* v. *Mas-
sachusetts Prop. Ins. Underwriting Ass'n,* 386 Mass. 450, 452-454 (1982)
(reviewing history of MPIUA).

The case was reported by *Greaney*, J.

*Monica Brookman*, Assistant Attorney General (*Glenn Kaplan & Aaron Lamb*, Assistant Attorneys General, with her) for the plaintiff.

*John G. Ryan*, Special Assistant Attorney General (*Julie D. McAlarney* with him) for the defendant.

*Cameron F. Kerry* (*A.W. Phinney, III, & Jennifer Alcarez* with him) for the intervener.

The following submitted briefs for amici curiae:

*Stephen D'Amato* for Citizens for Homeowners Insurance Reform.

*Robert A. O'Leary, Eric T. Turkington, Cleon H. Turner & Sarah K. Peake*, pro se.

*Peter S. Rice & Jeffrey S. Strom* for Property Casualty Insurers Association & another.

Cordy, J. On June 30, 2006, the Commissioner of Insurance (commissioner) released her decision and order on the 2005 rate filings of the Massachusetts Property Insurance Underwriting Association (MPIUA), finding, with two exceptions, that the components underlying its proposed rates for basic property and casualty insurance were "reasonable or fall within a range of reasonableness" (June 30 decision). In light of this finding, the commissioner conditionally disapproved MPIUA's proposed rates; advised MPIUA of what would be reasonable with respect to the rate components she rejected; and invited MPIUA to make a revised filing within thirty days, which, if it met her requirements, would be approved.[2]

On August 11, 2006, after MPIUA had submitted a revised filing, the commissioner approved the revised rates, declaring them not "excessive, unfairly discriminatory or inadequate" (August 11 decision). The rates were to be effective October 1, 2006.[3]

The Attorney General, who had opposed approval of the

---

[2]The commissioner also gave MPIUA the option of submitting a new filing for different rates. She noted that a new filing would be subject anew to the procedures of the Administrative Procedures Act, G. L. c. 30A.

[3]The proposed rates were to be effective as of December 31, 2005. In her June 30 decision, the commissioner rejected MPIUA's request that the rates be retroactive to December 31, 2005.

proposed rates during the hearings preceding the commissioner's June 30 decision, sought judicial review in the Supreme Judicial Court for Suffolk County of several aspects of the August 11 decision. A single justice reserved and reported the case to the full court without decision.

In her appeal, the Attorney General contends that the rates approved by the commissioner exceed the cap on rate increases set by statute, G. L. c. 175C, § 5 (*c*), and disputes the commissioner's interpretation of a 2004 amendment to that statute — which directs her to consider predicted hurricane losses and costs of catastrophe reinsurance "notwithstanding" the statutory rate cap for large share territories — as authorizing her to approve rates that exceed that cap.[4] The Attorney General also contends that (1) in approving the rates, the commissioner failed explicitly to consider the loss experience of insurers in the voluntary market, as required by G. L. c. 175C, § 5 (*b*); (2) the commissioner abused her discretion in approving predicted hurricane losses based on the computer generated models relied on by MPIUA; and (3) the Attorney General was entitled to notice, a hearing, and a right to cross-examine witnesses on MPIUA's revised filing before the commissioner approved it.

We affirm.

1. *Rate approval framework.* MPIUA is an association of all property and casualty underwriters in Massachusetts. Pursuant to G. L. c. 175C, it operates the Massachusetts residual market for property and casualty insurance, with the goal of providing basic property insurance to eligible participants who are other-

---

[4]In relevant part, G. L. c. 175C, § 5 (*c*), provides:

> "The commissioner shall approve all rates for the association for homeowners insurance in large share territories only if the commissioner finds that: . . . (2) no rate for the territory in any calendar year increases over the lowest rate for that product charged by the association during the prior calendar year in the territory by more than the overall statewide average percentage increase in rates charged from [the previous year] for homeowners insurance by the 10 insurers with the largest market shares . . . on a statewide basis. *Notwithstanding clause (2), the commissioner shall consider the effects of predicted hurricane losses and the cost of catastrophe reinsurance on the rates charged by voluntary market insurers and the cost of catastrophe reinsurance and the predicted hurricane losses on the association approving rates for homeowners insurance in all territories*" (emphasis added).

wise unable to obtain insurance in the voluntary market.[5] See G. L. c. 175C, §§ 4 (*a*), 5 (*b*); *Hudson* v. *Massachusetts Prop. Ins. Underwriting Ass'n*, 386 Mass. 450, 452-454 (1982) (reviewing history of MPIUA). MPIUA supplies "homeowners insurance" coverage to residential property owners, and has increasingly provided such coverage to homeowners located in the coastal sections of Massachusetts where the voluntary market for insurance has receded.

When MPIUA seeks to increase the rates it charges for insurance, it must file the proposed increases with the commissioner in accordance with G. L. c. 174A and G. L. c. 175C, § 5 (*b*). The commissioner does not set MPIUA's rates; rather, she must approve them if they fall within a range of reasonableness, *Massachusetts Med. Serv.* v. *Commissioner of Ins.*, 344 Mass. 335, 339 (1962), and otherwise satisfy the requirements of the General Laws.[6] The commissioner may not approve rates that are "excessive, inadequate or unfairly discriminatory." G. L. c. 174A, § 5 (*a*) (2). MPIUA bears the burden of establishing that its proposed rates fall within a "range of reasonableness." *Travelers Indem. Co.* v. *Commissioner of Ins.*, 362 Mass. 301, 305 (1972). The commissioner can approve MPIUA rates only after proper notice and a hearing, subject to the adjudicatory procedures of G. L. c. 175C, § 5 (*b*).

In considering the reasonableness of MPIUA's proposed rates, G. L. c. 175C, § 5 (*b*), requires that the commissioner give consideration, in addition to all other relevant factors, "to the loss experience of insurers in the voluntary market, as well as the experience of the association and to the intent of this chapter to make basic property insurance available at reasonable cost to eligible applicants in large share territories." Large share territories are those in which MPIUA has a large market share; small share territories are those in which MPIUA has minimal market share and consumers have a choice among providers. See G. L. c. 175C, § 1. The rates in dispute in this appeal are those that apply to "large share territories."

---

[5]The MPIUA functions as an insurance company in its own right. Its underwriter members share in its profits and losses.

[6]The commissioner's role in approving MPIUA's rates contrasts with the role she plays in setting rates for automobile insurance under G. L. c. 175, § 113B (commissioner shall "fix and establish" automobile insurance rates).

Section 5 (*c*) establishes a statutory cap on rate increases applicable to large share territories. It is undisputed that (for the time period at issue) the cap on rate increases for those territories, calculated in accord with the formula set out in § 5 (*c*), was 5.9 per cent. The rate increases sought by MPIUA in its 2005 filings exceeded this cap.

Section 5 (*c*), as appearing in St. 2004, c. 436, § 3, also provides that "notwithstanding" the cap on rate increases, "the commissioner shall consider the effects of predicted hurricane losses and the cost of catastrophe reinsurance on the rates charged by voluntary market insurers and the cost of catastrophe reinsurance and the predicted hurricane losses on the association approving rates for homeowners insurance in all territories."

2. *The commissioner's hearing and decisions.* In its 2005 filings, MPIUA sought an over-all increase of 12.5 per cent in the rates for homeowners multi-peril insurance, and 6.4 per cent in the rates for dwelling fire and extended coverage insurance. It sought no increase in commercial fire and allied lines coverage. The proposed increases varied across territories, with increases greater than those allowed under the rate cap in three large territories: a twenty-five per cent increase in territory 37 — made up of the counties of Barnstable, Dukes, and Nantucket — a twenty per cent increase in territory 33 — the city of New Bedford — and a 9.5 per cent increase in territory 32 — the city of Fall River. After providing notice, the commissioner held hearings in accord with G. L. c. 30A, § 14. Experts and other witnesses testified in favor of and against the proposed rates, and were cross-examined extensively during twenty days of evidentiary hearings, after which the parties submitted briefs.[7]

In connection with reviewing MPIUA's proposed rates, the commissioner was required to interpret and apply the amended language of § 5 (*c*). In her decision she reviewed the history leading up to the 2004 amendment and interpreted what, in her words, might initially appear to be its "opaque" language, in light of what she understood the Legislature intended to accomplish. The commissioner concluded that § 5 (*c*) authorized her "to approve, in her discretion, a proposed rate for a large

---

[7]Voluminous prefiled testimony and documentary exhibits also were admitted in evidence during the proceedings.

share territory that exceeds the statutory cap" of 5.9 per cent "but only to the extent that the amount of the increase in excess of the cap . . . is based solely on 'the effects of predicted hurricane losses and the cost of catastrophe reinsurance on rates charged by voluntary market insurers and the cost of catastrophe reinsurance and the predicted losses' " on the MPIUA.[8]

She found further that increases exceeding the cap in the three large territories reflected and were justified by the impact of "predicted hurricane losses and the costs of reinsurance." She also noted that the MPIUA had tempered its proposed increases: the proposed rates being lower than the rates "indicated" by the results of hurricane modeling,[9] and not including any profit factor, although such a factor is a common component of insurance ratemaking. See *Century Cab Inc.* v. *Commissioner of Ins.*, 327 Mass. 652, 663 (1951).

The commissioner also determined that it was appropriate to use computer generated models (rather than historically based calculations) to predict hurricane losses insofar as the use of such models had become widespread in the insurance industry. The models estimate average losses based on probabilistic simulations of 10,000 to 100,000 years of hurricanes, whereas historical data is substantially more limited.

In its rate filings, MPIUA relied on two specific computer generated mathematical models to predict hurricane losses: one created by the Air Worldwide Corporation (AIR) and the other by the Risk Management Solutions (RMS). MPIUA averaged the results generated by each of the two models, creating a blended estimate. Based on testimony that the AIR and RMS models are widely utilized by insurers, reinsurers, rating agencies, governments, and others, the commissioner found their use by MPIUA to be reasonable.[10]

---

[8]The commissioner also determined that the 2004 amendment to G. L. c. 175C, § 5 (*c*), did not affect small share territories.

[9]Indicated rates are the results generated by hurricane models and other rate factors — rates that justifiably could be imposed based on the rate calculation input factors. The indicated rate level change for territory 37 was 68.5 per cent; the MPIUA proposed change was twenty-five per cent. The indicated rate level change for territory 33 was 64.7 per cent; the MPIUA proposed change was twenty per cent.

[10]In concluding that the use of these models and their predicted results was

As noted above, at the conclusion of the rate-approval proceedings, the commissioner conditionally disapproved the rate filings, based on concerns with respect to two rate components. First, although the proposed rate included the cost of reinsurance, MPIUA had not purchased reinsurance and did not demonstrate a commitment to make that purchase. The commissioner found, however, that the proposed $13 million value for the net cost (premium) of reinsurance (to cover catastrophe losses greater than $520 million) would be reasonable to factor into the rate, if expended. Second, she had reservations about the rate's "nonmodeled" loss values, including the values attributed to "demand surge,"[11] and to underevaluation. She then invited MPIUA to refile and demonstrate (1) that it had purchased reinsurance with a premium of at least $17.5 million (of which she would permit $13 million to be factored into the rates), and (2) that it had conformed its nonmodeled loss values to those she concluded would be reasonable, which were set forth in the decision.

The June 30 decision stated that it could be appealed pursuant to G. L. c. 30A. The Attorney General did not appeal the decision or request reconsideration of any of the commissioner's findings and conclusions. On July 28 MPIUA submitted its revised rate filing.

In that filing, MPIUA provided proof of a "final and binding" purchase of reinsurance, with a premium of $38.375 million, including a record of the first quarterly reinsurance payment. It also adjusted the nonmodeled losses by (1) including a "demand surge" value of 3.2 per cent, which fell within the one to five per cent range that the commissioner had deemed reasonable; (2) limiting the proposed nonmodeled "other expenses" for the effect of undervaluation to five per cent, as also deemed reasonable in the commissioner's decision; and (3) removing all

reasonable, the commissioner noted that market forces exert pressure on hurricane modelers to be as accurate as possible. Sellers of reinsurance will rely on the models only if their predictions are not understated; otherwise they would not charge enough for reinsurance. Primary insurers, potential buyers of reinsurance, on the other hand, will rely on the models only if their predictions are not overstated; otherwise they will keep excessive reserves or pay too much for reinsurance.

[11]"Demand surge" is defined as "short term price inflation for labor and materials caused by an increase in demand for and a shortage of goods and services created by a natural catastrophe."

other nonmodeled losses. As the refiled rates contained proposed rate components within the value ranges the commissioner had concluded were reasonable in her June 30 decision, she approved the rates on August 11.[12]

On August 14, the commissioner received a letter from the Attorney General dated August 11, requesting a full evidentiary hearing on the revised filing. The deputy commissioner responded that no additional hearing was required as the revised filing was submitted in response to the order issued on June 30, and was consistent with the commissioner's findings that were the result of an eight-month long rate approval proceeding. She also explained that the issue was moot because the division of insurance had not received the letter until three days after it had issued its final decision on the rates.

3. *Discussion.* The court's review of the commissioner's decision is governed by G. L. c. 30A, § 14 (7). See G. L. c. 175C, § 5 (*b*). We may set aside or modify an agency decision if we determine "that the substantial rights of any party may have been prejudiced because the agency decision is" in violation of constitutional provisions, in excess of statutory authority or jurisdiction of the agency, based on an error or law; made on unlawful procedure; unsupported by substantial evidence; unwarranted by the facts found by the court on the record as submitted or as amplified; or arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7). In reviewing the decision, we are required to "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." *Id.*

*G. L. c. 175C, § 5 (c).* The principal issue in this case is the proper interpretation of § 5 (*c*), as rewritten in 2004, and whether that section grants the commissioner the authority to approve an increase in rates beyond the rate increase cap in the circumstances presented here.

---

[12]The original proposed rate reflected an over-all average increase of 12.5 per cent for homeowners multi-peril insurance and of 6.4 per cent for dwelling, fire, and extended coverage insurance. The revised filing proposed an increase of 12.4 per cent for homeowners multi-peril insurance, and an increase of 5.7 per cent for dwelling, fire, and extended coverage insurance.

We review questions of statutory interpretation de novo, *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006), giving "substantial deference to a reasonable interpretation of a statute by the administrative agency charged with its administration enforcement." *Id.* See *Eastern Cas. Ins. Co.* v. *Commissioner of Ins.*, 67 Mass. App. Ct. 678, 683 (2006), quoting *Massachusetts Med. Soc'y* v. *Commissioner of Ins.*, 402 Mass. 44, 62 (1988) ("Where the Commissioner's statutory interpretation is reasonable . . . [we do] not supplant his judgment"). This includes approving an agency's interpretation of statutory language that may be read in two ways. *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities Siting Bd.*, 448 Mass. 45, 50-51 n.6 (2006). Such deference is particularly appropriate in cases involving the interpretation of a complex statutory and regulatory framework. *MCI Telecommunications Corp.* v. *Department of Telecommunications & Energy*, 435 Mass. 144, 150-151 (2001). However, "[a]n incorrect interpretation of a statute . . . is not entitled to deference." *Commerce Ins. Co.* v. *Commissioner of Ins.*, supra, quoting *Kszepka's Case*, 408 Mass. 843, 847 (1990). The Attorney General has the burden of proving that the commissioner's interpretation is unreasonable.

The statute's wording supports the commissioner's interpretation. The Legislature's use of the words "[n]otwithstanding clause (2)," the rate cap clause, evidences an intent to afford relief from that cap. It authorizes the commissioner to approve rates, based on her consideration of certain specified factors ("the effects of predicted hurricane losses and the cost of catastrophe reinsurance" on rates in the voluntary market and on the association), "notwithstanding" the rate cap. "The use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros* v. *Alpine Ridge Group*, 508 U.S. 10, 18 (1993). A "clearer statement is difficult to imagine." *Liberty Maritime Corp.* v. *United States*, 928 F.2d 413, 416 (D.C. Cir. 1991), quoting *Crowley Caribbean Transp., Inc.* v. *United States*, 865 F.2d 1281, 1283 (D.C. Cir. 1989). See, e.g., *Administrative Justice of the Hous. Court Dep't* v. *Commissioner of Admin.*, 391 Mass. 198, 202 (1984) (finding "legislative intent is clear" in phrase

"notwithstanding the provisions . . . of [G. L. c. 211B] to the contrary," so that appropriation acts supersede general salary provisions established in G. L. c. 211B).[13]

If we were to conclude that the effect of the newly added clause was merely to direct the commissioner to consider hurricane losses and the cost of reinsurance when approving MPIUA's rates, we would essentially be ascribing no meaning to the "notwithstanding" language. See *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998), quoting 2A B. Singer, Sutherland Statutory Construction § 46.06 (5th ed. 1992) (statutes should be construed "so that effect is given to all its provisions, so that no part will be inoperative or superfluous"); *Commonwealth* v. *Fall River Motor Sales, Inc.*, 409 Mass. 302, 316 (1991) (statute's words should be read as whole to produce internal consistency). Prior to the 2004 amendment, G. L. c. 174A and 175C already permitted and directed the commissioner to consider the impact of predicted losses and cost of reinsurance on rates in determining whether to approve MPIUA's rates. For example, G. L. c. 174A, § 5 (*a*) (3), mandates that the commissioner give due consideration to "past and prospective loss experience within and outside this commonwealth, to the conflagration and catastrophe hazards, to a reasonable margin for underwriting profit and contingencies . . . and to all other relevant factors within and outside this commonwealth." It further provides that "[i]n considering catastrophe hazards with respect to homeowners insurance rates, the commissioner shall consider catastrophe reinsurance and factors relating thereto." *Id.*

In sum, "the 'notwithstanding' clause takes on meaning only when we assume that the new Act has made some change in the law to which the 'notwithstanding' statement is noting a specific exception." *Shomberg* v. *United States*, 348 U.S. 540, 546

---

[13]Dictionary definitions of "notwithstanding" similarly support the commissioner's interpretation: 2 Shorter Oxford English Dictionary 1948 (5th ed. 2002), for example, defines it as meaning "[i]n spite of" or "without regard to." Webster's Third Int'l Dictionary 1545 (1993) defines "notwithstanding" as "in spite of," and "without prevention or obstruction." The use of dictionary definitions is a valid and prevalent way to interpret statutes in the administrative law context. See *Babbitt* v. *Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687 (1995) (debating correct meaning of "harm").

(1955). That change is to override the rate cap when consideration of the "predicted hurricane losses and the cost of catastrophe reinsurance" require it. G. L. c. 175C, § 5 (*c*).

The legislative history of the 2004 amendment also comports with the commissioner's interpretation. In a 2004 report to the Legislature entitled, "On the Current State of the Homeowners Insurance Market in the Commonwealth," the commissioner outlined changes in the over-all market which began in 1992, the effects of those changes on the availability of homeowners insurance in the voluntary market, and her concerns about the adequacy of MPIUA's rates due to its increased exposure in high risk areas and the constraints of the rate cap.[14] For example, the commissioner reported that from December 31, 1998, to 2003, due to the rate cap, MPIUA's annual increases were always under two per cent. In two of those years, the rates actually decreased. Meanwhile, MPIUA was suffering underwriting losses.[15] As the commissioner explained, the MPIUA rates were low, "despite loss experience that would warrant a significant rate increase to

---

[14]Prior to 1992, insurers relied on decades of hurricane wind experience and other historical factors to estimate losses. However, following the havoc wreaked by Hurricane Andrew in 1992, as well as the Northridge earthquake in 1994, many in the insurance industry concluded that this historical method understated risk. This led to the development of computer-generated models that predicted potential losses. This, in turn, led to significant increases in insurance costs.

As the cost of providing insurance for high risk areas increased significantly, voluntary insurers began withdrawing coverage from these areas to reduce their risk exposure. In the wake of their withdrawal, MPIUA was deluged with demand for coverage. As a result, by 2004, the MPIUA's market share in the coastal and island territories had experienced a dramatic increase. MPIUA quickly became the largest writer of homeowners insurance on Cape Cod and the islands of Martha's Vineyard and Nantucket. Even when voluntary coverage was available, the disparity between the rates charged by MPIUA and the voluntary insurers resulted in an increased market share and exposure for MPIUA. Consequently, MPIUA found itself in the precarious position of having unusually high exposure in the territories that were most at risk of hurricane damage, without the ability to readily increase rates, recover higher premiums, or spread risk.

[15]MPIUA's average underwriting profit-loss per policy over fiscal years 1994-2003 is a loss of $81 per policy, and of $101 per policy excluding the year 1998, which experienced unusual profits. In fiscal years 2000, 2001, 2002, and 2003, MPIUA experienced an underwriting loss per policy of $26, $113, $84, and $138 respectively.

bring rates to the break-even point, *but for statutory prohibitions*" (emphasis added).

The Legislature responded promptly to the commissioner's report, which was filed on October 1, 2004, by enacting an amendment to G. L. c. 175C, § 5, on December 22, 2004. Statute 2004, c. 436, § 3. This amendment was plainly intended to ameliorate the conditions identified by the commissioner. The versions of the amendment as it moved through the legislative process evidence an intent to override the rate cap. The initially filed bill mandated a minimum two per cent increase in MPIUA rates for large share territories, "notwithstanding" the cap. After a legislative hearing, the bill was amended to require a minimum three per cent increase. It was then further amended on the floor of the House (House Bill No. 4672 at 3) by striking the minimum mandated increase of three per cent, but retaining the word "notwithstanding." A fair reading of this history is that the Legislature intended to leave to the commissioner's discretion how much of an increase over the rate cap (if any) would be reasonable in light of the effects of predicted hurricane losses and the cost of reinsurance.

*Voluntary market loss.* General Laws c. 175C, § 5 (*b*), provides that the loss experience of insurers in the voluntary market is one of a variety of factors that the commissioner is to consider in deciding whether to approve MPIUA rates. The Attorney General argues that the commissioner's decision is inadequate to allow the court to determine how or whether she considered the loss experience of voluntary market insurers in approving MPIUA rate filing; thus, the court cannot determine whether the commissioner committed an error of law.

We agree that the loss experience of voluntary market insurers is an important factor in the commissioner's review of MPIUA rate filings. However, G. L. c. 175C, § 5 (*b*), does not require either explicit consideration or express findings by the commissioner. It merely mandates consideration. Cf. G. L. c. 175, § 113B (commissioner shall "explicitly" consider recent loss experience and make "express findings" concerning this factor); *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 371 (1990). The decision by an agency or a court "not to refer in a decision to a particular piece of evidence does not imply the failure to consider that evidence when ruling on the

issue." *Catlin* v. *Board of Registration of Architects*, 414 Mass. 1, 6 (1992). The record reflects that the commissioner considered the statutory requirements, and the Attorney General has failed to show that her substantial rights were prejudiced by the absence of an explicit discussion of voluntary market loss in the commissioner's decision. See G. L. c. 30A, § 14 (7).

First, all parties to the hearing (including the Attorney General) consented to the use of the loss data of all insurers writing homeowners insurance in Massachusetts in determining MPIUA's projected loss costs and other calculations underlying its rate filing. As the commissioner noted in her June 30 decision, no party disputed MPIUA loss data and (as MPIUA's filing explained) MPIUA's loss factors were developed "in conjunction with the Massachusetts voluntary Homeowners loss cost review process." It was reasonable for the commissioner to conclude that loss data from the voluntary market was used in determining MPIUA's projected loss costs. Second, the commissioner considered and ultimately relied on the shift by voluntary insurers from reliance on historical data to the use of mathematical models to estimate their hurricane losses, and concluded that MPIUA's approach was "consistent with that of other insurers." Third, the commissioner's calculation of the rate cap itself was based on the rate increases (which are based on loss experience) of the ten insurers with the largest voluntary market share on a Statewide basis. No further consideration of the loss experience in the voluntary market was required.[16]

*The use of hurricane models.* The commissioner approved

---

[16]In the rate approval proceeding, the Attorney General did not make any argument about or propose any particular role that the voluntary loss experience evidence should play in the commissioner's decision. Indeed, in her closing brief filed with the commissioner, the Attorney General only mentions the requirement that the commissioner consider the voluntary market loss experience in two sentences. The Attorney General now suggests that consideration of the loss experience factor would have led to a different result, stating, "in conjunction with the increasing profitability of the MPIUA — it reported profits for 2004 and 2005 — the loss experience of the voluntary market carriers makes clear that enormous rate increases are not reasonable." This argument is unavailing. In the ten-year period in which voluntary insurers generated good underwriting results, there were no hurricanes. In recent years, MPIUA's exposure in high hurricane risk territories has mushroomed, as voluntary insurers have been leaving those markets. Thus, MPIUA's situation is markedly different from that of voluntary market insurers. Because no hur-

MPIUA's use of AIR and RMS computer generated models to estimate projected hurricane losses. The commissioner has "wide discretion in weighing conflicting evidence and gauging the credibility of witnesses," *Attorney Gen.* v. *Commissioner of Ins.*, 442 Mass. 793, 796 (2004), and considerable latitude in evaluating the relative merits of different methods used to calculate projected losses and profits. *Id.* at 799-800. Deference to the commissioner's experience, technical competence, specialized knowledge, and discretionary authority are "particularly appropriate when reviewing her choice of methodology." *Automobile Insurers Bur. of Mass.* v. *Commissioner of Ins.*, 430 Mass. 285, 296 (1999).

Substantial evidence supported her decision. There was expert testimony that the use of models to estimate potential hurricane losses had become the standard in insurance markets for actuaries, insurers and reinsurers, rating agencies and regulators, and that the AIR and RMS models are the most reliable and widely used in the field.[17] Even opposing experts supported or had used them. The Attorney General's expert advocated using the AIR model combined with historical data. The witness for the State Rating Bureau (SRB) supported the use of the AIR model, and admitted to using the RMS model in his consulting work. See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 24 (1994) ("if there is general acceptance in the relevant scientific community, the prospects are high . . . that the . . . process is reliable").

ricanes have struck Massachusetts since 1991, and because of the MPIUA's unique position, it was reasonable for the commissioner to conclude that further review of the voluntary market loss experience would have been only marginally helpful in considering the reasonableness of MPIUA's proposed rates and projected losses.

[17]There was testimony that Air Worldwide Corporation (AIR) and Risk Management Solutions (RMS) are the leading providers of catastrophe models globally. Their models are fundamentally similar in that each are built around three core functions: hazard, vulnerability, and financial analysis. The goal of both models is to develop a realistic set of potential hurricanes so that users can estimate losses from thousands of simulated, but realistic, events. In general, the RMS model produces higher loss estimates for coastal exposures while the AIR model produces higher loss estimates for inland exposures. RMS's treatment of coastal exposures is largely a function of the way it models transitioning storms. The commissioner concluded that the two models defined a range of expected hurricane losses for portfolios significantly exposed to hurricanes hitting Massachusetts.

There was also expert testimony in support of MIUPA's decision to average the model results, in particular that: "The blended result is thought to offer a more balanced estimate of probable catastrophic losses."

The Attorney General's principal argument to the contrary is that the AIR and RMS models are not fully tailored to Massachusetts. In her June 30 decision, the commissioner agreed with the Attorney General that a model "should consider both specific provisions in the Massachusetts building code relating to wind loading in various regions of the state, as well as building practices in areas where the exposure base includes a significant volume of new construction that must comply with local guidelines that are stricter than the state code." While this level of specificity was not established by MPIUA's experts, there was testimony from several experts, including the SRB expert, that the models took into account "the building features of structures in Massachusetts." Consequently, the commissioner found that "while the AIR and RMS hurricane models may not be perfectly calibrated to the characteristics of Massachusetts," they offered reliable evidence of the range of hurricane losses that might be experienced in the State. Thus, she concluded "that it was reasonable for the MPIUA to use the AIR and RMS models as predictors of hurricane losses." There was no error.

*G. L. c. 30A.* The Attorney General argues that the commissioner incorporated new fact evidence and then issued her August 11 decision without a required hearing, argument, or opportunity for cross examination, in violation of G. L. c. 30A, §§ 10 and 11 (3).

We agree with the commissioner that full and fair hearings were held on all issues. The commissioner's August 11 decision was based on MPIUA's submission documenting that it had complied with the requirements for approval that the commissioner had prescribed in her June 30 decision, to which the Attorney General had made no further objection. Evidence supporting the reasonableness of those requirements was fully presented and examined in hearings prior to the June 30 decision. The Attorney General had notice that the commissioner had invited and would accept a refiling if it met those requirements.

New hearings were not necessary on issues the commissioner had already determined. See *Associated Indus. of Mass., Inc.* v. *Commissioner of Ins.*, 403 Mass. 37, 42 (1988) ("there is no constitutional right to a specific kind of hearing or in further hearings on matters already determined by the commissioner").

For the reasons set forth above, we affirm the decision of the Commissioner of Insurance of August 11, 2006, approving the revised rates proposed by the Massachusetts Property Insurance Underwriting Association.

*So ordered.*