Onex Communications Corporation *vs.* Commissioner of Revenue.

No. 07-P-1805.

Suffolk. October 10, 2008. - July 13, 2009.

Present: Rapoza, C.J., Dreben, & Mills, JJ.

Further appellate review granted, 455 Mass. 1104 (2009).

*Taxation,* Personal property tax: abatement, Manufacturing corporation.

This court concluded that an interpretation of G. L. c. 63, §§ 38C and 42B (which exempt from sales and use tax a manufacturing corporation's purchases of personal property for research and development purposes), that limited designation of a manufacturing corporation to one that has achieved its intended final product would frustrate the purpose behind the exemption, which is to induce new industries to locate in the Commonwealth and to foster the expansion and development of existing industries [645-647]; thus, the Appellate Tax Board correctly decided that the taxpayer was a manufacturing corporation within the meaning of G. L. c. 63, § 42B, and therefore entitled to a use tax abatement (and cancellation of all penalties and interest) on certain purchases of personal property for research and development purposes, where the taxpayer's activities throughout the relevant period, which were directed toward devising and revising blueprints that specified how a computer chip was to be assembled, were essential and integral to the total manufacturing process [647-650].

Appeal from a decision of the Appellate Tax Board.

*Kenneth W. Salinger,* Assistant Attorney General, for Commissioner of Revenue.

*Richard L. Jones (William E. Halmkin* with him) for the taxpayer.

Mills, J. Onex Communications Corporation (Onex) was formed in 1999 to design and sell integrated circuits for use in the telecommunications industry.[1] Its efforts yielded the OMNI

[1]At all relevant times, Onex was a Delaware corporation with its principal place of business in Massachusetts.

chip,[2] early versions of which were produced, sold, and tested in 2001 before the device became generally available on the market in 2002. Able to accommodate thirty-two distinct voice channels on each of its 1,344 virtual circuits, a single OMNI chip could perform the work of ten chips made with prior technology. The product was revolutionary for its time and enabled substantial reductions in power use and system costs.

In 2002, the Department of Revenue (department) audited Onex's purchases of personal property. The audit period began on August 1, 1999, and extended through September 21, 2001.[3] Over the course of the audit period, Onex had purchased $2,723,510 of personal property for research and development (R&D) purposes, paying neither sales nor use tax. In December, 2002, the Commissioner of Revenue (commissioner) advised Onex that its R&D purchases had been taxable and that the department intended to assess use taxes of $136,175 plus interest and penalties. Onex requested an abatement, contending that the items purchased were "materials, machinery and replacement parts . . . used directly and exclusively in R&D" and were, as such, exempted from the use tax by G. L. c. 64H, § 6(*r*) and (*s*), as incorporated by G. L. c. 64I, § 7(*b*).[4] The request was denied on the grounds that Onex had qualified as neither a manufacturing nor a research and development corporation under G. L. c. 63, §§ 38C or 42B.[5] In the circumstances, at least one such qualification was necessary for Onex's R&D purchases to come within

---

[2]The OMNI chip is also referred to in the record as a "chip-set," apparently because it is actually made up of two microchips, one functioning as a "switch" and the other as a "network processor." For convenience we refer to the product simply as the OMNI chip.

[3]The end of the audit period coincided with the acquisition of Onex by TranSwitch Corporation. Like the parties, we refer to both the pre- and post-merger entities as "Onex" in order to minimize confusion.

[4]With exceptions not here relevant, G. L. c. 64I, § 7(*b*), exempts from the use tax any item that is exempted from the sales tax imposed by G. L. c. 64H.

[5]General Laws c. 64H, § 6(*r*) and (*s*), as amended through St. 1977, c. 620, §§ 1 and 2, contain tax exemptions for, inter alia, materials, machinery, and replacement parts "used directly and exclusively in . . . research and development by a manufacturing corporation or a research and development corporation within the meaning of [G. L. c. 63, §§ 38C or 42B]." The aforementioned §§ 38C and 42B are applicable to domestic and foreign corporations, respectively. As a Delaware corporation, Onex is governed by § 42B. See *Joseph T. Rossi Corp.* v. *State Tax Commn.*, 369 Mass. 178, 180 n.1 (1975).

the scope of the exemptions set forth in G. L. c. 64H, § 6(*r*) and (*s*).

Onex challenged the denial of its requested abatement before the Appellate Tax Board (board). The board ruled that Onex had been a manufacturing corporation within the meaning of G. L. c. 63, § 42B, throughout the audit period, and that assessment of the use tax had been improper.[6] Because we agree that Onex qualified as a § 42B manufacturing corporation throughout the audit period, we affirm the board's order directing a use tax abatement of $136,175 and cancellation of all penalties and interest.

*"Finished product" limitation.* The commissioner maintains that Onex could not have been a manufacturing corporation during the audit period essentially because, at the conclusion of that period, Onex had yet to achieve a finished product.[7] That analysis may have superficial appeal, but it is not compelled by the statute. Indeed, the statutory text does little, if anything, to clarify what exactly the Legislature intended to qualify within the ambit of manufacturing. The relevant provision, G. L. c. 63, § 42B, states only that a "manufacturing corporation" is one "engaged in manufacturing." See *Commissioner of Rev.* v. *Houghton Mifflin Co.*, 423 Mass. 42, 44 (1996).[8]

[6]The board reserved decision as to whether Onex had qualified as a § 42B research and development corporation throughout the audit period. The substance of Onex's cross-appeal is that the board's findings compel a ruling that Onex was, at all relevant times, a § 42B research and development corporation. The commissioner maintains that further findings would be necessary to resolve that matter. We acknowledge Onex's preservation of the issue, but otherwise leave it unaddressed.

[7]Onex disputes the commissioner's assertion that Onex achieved no tangible, finished product during the audit period. Specifically, Onex points to the production of at least fifty OMNI chips in early 2001, followed by the production of certain additional OMNI chips in mid-2001, the latter incorporating a design modification. The commissioner characterizes all the OMNI chips produced in 2001 as mere prototypes (see note 8, *infra*). Because we hold that designation as a § 42B manufacturing corporation does not require a finished product ex ante, we do not address whether some or all of the OMNI chips produced in 2001 ought to have been considered finished products.

[8]Department regulations contained at 830 Code Mass. Regs. § 58.2.1(6)(b) (1999), reproduced in part below, attempt to further illuminate the term "manufacturing." The commissioner emphasizes the guideline in subparagraph 5 to support her position, while Onex points to subparagraph 7:

"(b) Manufacturing. Manufacturing is the process of substantially

The pertinent decisional law, moreover, ascribes a far broader meaning to manufacturing than the minimalist interpretation urged by the commissioner. Massachusetts cases instruct that "[t]he words 'engaged in manufacturing' are not to be given a narrow or restricted meaning." *Assessors of Boston* v. *Commissioner of Corps. & Taxn.*, 323 Mass. 730, 748-749 (1949). Rather, the phrase is to be fairly construed and reasonably applied to effectuate legislative intent. *Id.* at 741. We have long inferred, without contradiction from the Legislature, that the tax exemption at issue was intended "[to] induc[e] new industries to locate [in the Commonwealth] and to foster the expansion and development of [its existing] industries . . . ." *Ibid.* See *Houghton Mifflin Co.*, 423 Mass. at 46-47.

That purpose would be substantially frustrated were we to interpret §§ 38C and 42B to mean that no corporation may be designated a manufacturing corporation until it has achieved its intended finished product. In particular, we note that such a policy would place new or specialized corporations in a highly disadvantageous tax position. Consider the R&D purchases of an established corporation that, in addition to its R&D efforts, engages in the assembly and sale of an entirely unrelated product. Provided these latter, clearly manufacturing activities are substantial, the corporation will be entitled to classification as a manufacturing corpora-

transforming raw or finished materials by hand or machinery, and through human skill and knowledge, into a product possessing a new name, nature and adapted to a new use. In determining whether a process constitutes manufacturing, the Commissioner will examine the facts and circumstances of each case. However, the following principles will serve as guidelines:

". . .

"5. Manufacturing ordinarily involves the production of products in standardized sizes and qualities and in multiple quantities. Market research, research and development, and design and creation of a prototype, although prerequisites to manufacturing, are not manufacturing.

". . .

"7. A process which does not produce a finished product, but constitutes an essential and integral part of a total manufacturing process, may constitute manufacturing. A process that is a practical and necessary step in the production of a finished product for sale is generally an essential and integral part of a total manufacturing process."

tion, and its R&D purchases, despite their irrelevance to the corporation's existing finished product, will be exempt from sales and use taxation.[9] Now consider identical R&D purchases, made in furtherance of R&D efforts identical to those underway at the established corporation, but this time by a new corporation that has no preexisting finished product. Under the commissioner's interpretation of the statute, the new corporation would be barred from qualifying as a manufacturing corporation and its R&D purchases would be subject to taxation.[10] That result is arbitrary and inimical to the Legislature's purpose in enacting the statute.

*Classification of Onex's activities.* Having dispensed with the commissioner's contemplated finished product limitation, we must now consider at what times, if any, Onex was engaged in substantial manufacturing activities.

We first note, but do not rely on, an amendment to §§ 38C and 42B that took effect in 2006, several years after the present assessment against Onex. "[T]he development and sale of standardized computer software," the text added by the amendment reads, "shall be considered a manufacturing activity, without regard to the manner of delivery of the software to the customer." G. L. c. 63, §§ 38C, 42B, as amended through St. 2005, c. 163, §§ 27, 29, 59. Enactment of this language, which brings the creation of intangible software products within the statutory definition of manufacturing, cannot be reconciled with a legislative conception of manufacturing that is confined to the assembly line. Even before the aforementioned amendment to §§ 38C and 42B, however, Onex's activities would properly have been classified as manufacturing.

The board found, on substantial evidence, that Onex was

---

[9]Classification as a manufacturing corporation does not require that manufacturing operations constitute the principal business of the corporation so classified. Rather, any such operations that are substantial, in relative or absolute terms, will suffice. See *Commissioner of Corps. & Taxn.* v. *Assessors of Boston*, 321 Mass. 90, 96-97 (1947).

[10]While this outcome could be avoided if the new corporation were able to qualify as a § 38C or § 42B research and development corporation, the law is unclear both as to (1) whether a corporation that has no receipts may so qualify, and (2) what constitutes "receipts" in this context. See note 6, *supra*. Moreover, manufacturing corporations are entitled to certain local tax exemptions not available to research and development corporations. See G. L. c. 63, §§ 38C, 42B.

founded for the purpose of designing and manufacturing a micro-chip device to enhance data transmission over communications networks. Work on that device, ultimately branded as the OMNI chip, began from a blank sheet of paper. Onex engineers cre-ated, refined, integrated, and embedded OMNI's numerous soft-ware and hardware components. From a physical standpoint, the board's findings establish that "[t]iny internal modules had to be interwoven, integrated, and laid out to enable the intended functionality." To that end, Onex engineers drafted intricate electronically-stored "blueprints" to direct, with absolute preci-sion, the physical construction of the OMNI chip from raw silicon and the embedding of the software into the hardware.[11] Testimony credited by the board established that the develop-ment of these blueprints "was an essential step in manufactur-ing the OMNI chip." In sum, the board properly found, on the basis of the evidence before it, that "Onex's activities during the audit period centered on taking the OMNI chip from abstract concept to production." It then ruled, as matter of law, that the entirety of this process constituted manufacturing. We agree. "[P]rocesses which do not in themselves produce a finished product are nonetheless 'manufacturing' if they comprise an 'essential and integral part of a total manufacturing process.' " *Houghton Mifflin Co.*, 423 Mass. at 47, quoting from *William F. Sullivan & Co. v. Commissioner of Rev.*, 413 Mass. 576, 580 (1992).

In *Houghton Mifflin Co.*, 423 Mass. at 50, the court held that the creation of electronic proofs of the pages of a textbook constituted manufacturing. Preparation of the proofs began with editors, generally employees of Houghton Mifflin, engaging in "extensive research and development activities regarding a proposed book" to assess marketability and determine potential

---

[11]Because Onex lacked the sophisticated equipment necessary to assemble the OMNI chip internally, it outsourced that task to another corporation from July, 2000, through December, 2005. That corporation was required to imple-ment Onex's blueprints with exactitude, and the contract provided that all completed chips were the property of Onex. This arrangement does not impair Onex's status as a manufacturing corporation. See *Houghton Mifflin Co.*, 423 Mass. at 44, 48-51 (preparation of the electronic proofs for a textbook held to constitute manufacturing, notwithstanding that all printing and binding tasks were outsourced).

content and formatting. *Id.* at 43. Composition and editing of a manuscript followed, in addition to the creation or gathering of illustrative charts, graphs, drawings, and photographs. *Id.* at 43-44. The exact placement of these various items was specified in the electronic proofs ultimately sent to outside vendors for printing and binding. *Id.* at 44, 50-51. As such, the court observed that "[Houghton Mifflin] transforms ideas, art, information, and photographs, by application of human knowledge, intelligence, and skill, into computer disks, ready for use by independent printers, containing an immense amount of information in a highly organized form" and concluded that these activities sufficed to warrant designation as a manufacturing corporation. *Id.* at 48, 50-51. In reaching this conclusion, the court emphasized that the electronic proofs were not "valued solely for their artistic and intellectual content" but were, rather, "valuable principally because they [were] physically useful in making the finished product." *Id.* at 49. See *Commissioner of Rev.* v. *Fashion Affiliates, Inc.*, 387 Mass. 543, 545-546 (1982). The court, we note, was not concerned with whether the finished product had yet materialized. Its inquiry instead focused on the manufacturing process that was underway — one which, the context makes clear, was reasonably calculated to culminate in a finished product. The court agreed with the board that Houghton Mifflin's operations "produce a significant degree of change and refinement to the materials involved and . . . are essential and integral steps in the manufacture of conventional books." *Houghton Mifflin Co.*, 423 Mass. at 49. The court specifically acknowledged that some of the "materials" involved were intangible. *Id.* at 48.

The board's ruling here drew many sound comparisons between Onex's activities during the audit period and the manufacturing process delineated in *Houghton Mifflin Co., supra.* Onex's creation of blueprints, the purpose of which was to direct with absolute specificity the manner in which the OMNI chip was to be assembled, does not admit of meaningful differentiation from Houghton Mifflin's creation of electronic proofs of textbook pages. In each instance, a vast amount of information was marshaled in a manner sufficient to permit, and for the express purpose of permitting, assembly of a physical object intended to unleash the benefit of the information so organized. The board properly

found that Onex's activities throughout the audit period were directed toward devising and refining the blueprints that specified how to assemble the OMNI chip. As such, all of Onex's activities during that period were essential and integral to the total manufacturing process, a circumstance entitling Onex to classification as a manufacturing corporation.

*Conclusion.* The decision of the board is affirmed in all respects.

*So ordered.*