ONEX COMMUNICATIONS CORPORATION *vs.* COMMISSIONER OF
REVENUE.

Suffolk. April 7, 2010. - July 30, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Taxation,* Personal property tax: abatement, Manufacturing corporation.

This court, in interpreting G. L. c. 64H, § 6 (*r*) and (*s*), and G. L. c. 64I, § 7 (*b*), which provide an exemption from use tax for companies engaged in manufacturing, concluded that the proper test for determining whether a company is engaged in manufacturing is whether the company is engaged in an "essential and integral" step in the manufacturing process during the relevant time period, and that the use of a test that requires a company to have produced at least one finished product was inconsistent with case law and contrary to the statutory purpose of encouraging new manufacturing companies to locate in the State and fostering the development and expansion of existing companies. [425-429]

The Appellate Tax Board correctly concluded that a taxpayer was a manufacturing corporation as defined in G. L. c. 63, § 42B, and was therefore entitled to a use tax abatement on certain purchases of personal property, where, throughout the relevant period, the taxpayer was engaged in an essential and integral step in the process of manufacturing (i.e., the creation of a blueprint for the production of a computer chip), and where manufacturing was a substantial portion of the taxpayer's business during the relevant period. [430-432]

APPEAL from a decision of the Appellate Tax Board.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kenneth W. Salinger,* Assistant Attorney General, for Commissioner of Revenue.

*Richard L. Jones (William E. Halmkin* with him) for the taxpayer.

COWIN, J. The plaintiff, a company engaged in the development and production of integrated circuits for data and voice transmissions for the telecommunications industry, sought an abatement of use tax from August 1, 1999, to September 21, 2001, pursuant to G. L. c. 64I, § 7 (*b*), for equipment it pur-

chased to develop a cutting-edge switching chip set. The Appellate Tax Board (board) determined that the plaintiff was engaged in manufacturing as defined in G. L. c. 63, § 42B, and that the disputed assessment pertained to items used in research and development by a manufacturing corporation. Therefore, the board concluded that the plaintiff was entitled to the abatement. The Commissioner of Revenue (commissioner) appealed on the ground that, at the time of the purchases, the plaintiff was engaged in development and not manufacturing and therefore did not qualify for the abatement. We affirm the decision of the board.

1. *Background and prior proceedings.* The essential facts are not disputed. We recite some of them here, leaving the remainder for discussion with the issues presented. The plaintiff, Onex Communications Corporation (Onex), was a Delaware corporation with a principal place of business in Bedford.[1] It was incorporated in May, 1999, for the purpose of bringing to market a then cutting-edge telecommunications switching chip set, known as the OMNI chip, which was able to perform work previously requiring ten separate chips.[2] This advancement produced significant space and cost savings for the telecommunications industry. The OMNI chip had been designed and concept tested, and patent applications had been filed by engineers at Transwitch Corp. (Transwitch) prior to the formation of Onex; Onex was founded by former employees of Transwitch and several venture capital firms.

From August 1, 1999, to September 21, 2001, the period for which the Department of Revenue (department) audited Onex's purchases of personal property[3] and issued an assessment for nonpayment of use tax, Onex devoted most of its efforts to

---

[1]Onex Communications Corporation (Onex) was acquired by and merged into Transwitch Corp. (Transwitch) in September, 2001, and subsequently operated under the name Opal Acquisition Corporation. For convenience, we refer to both entities as Onex. See *infra.*

[2]The OMNI chip set consisted of two separate "application software specific circuit" (ASSC) silicon microchips containing ten million interconnections; one chip acted as a switch and the other as a network processor. Onex's complex software for the switching and routing of different types of data was embedded in both chips.

[3]The property in question consisted largely of computer software and hardware, laboratory equipment, and furniture and fixtures. Onex did not pay use tax for the purchases at issue when it filed its annual tax returns.

creating a "blueprint" for the production of the OMNI chip. The "blueprint" was "a computer-edited design that included technical specifications of the hardware and software components" of the two chips that made up the OMNI chip set and "included detailed manufacturing instructions."

Early in the audit period, on September 17, 1999, Onex entered into a barter marketing contract with Transwitch whereby Transwitch would market the OMNI chip as one of its own technologies. During the audit period, Onex executed a contract with IBM to produce the OMNI chip. IBM produced sample chips by early 2001; these chips were delivered to Onex for analysis and testing, after which the "blueprint" was further refined and a modified "blueprint" was given to IBM in "mid-2001." In September, 2000, Onex secured its first "beta" customer, Polaris Networks (Polaris).[4] Onex delivered a small number of chips to Polaris in 2001, and significantly larger quantities in early 2002 when the OMNI chip became generally available. Onex was acquired by and merged into Transwitch on September 21, 2001, the date on which the commissioner chose to terminate the audit period. The board concluded that "[p]roduction in commercial quantities followed seamlessly from Onex's ongoing activities begun in 1999 and was unaffected by the corporate reorganization which happened in September, 2001."

The department began an audit of Onex in July, 2001, for nonpayment of use tax. As a result of the audit, the commissioner concluded that Onex was not exempt from the requirement to pay use tax on its purchases of personal property in the amount of $2,723,510. The commissioner determined that the purchases at issue qualified as purchases for research and development purposes pursuant to G. L. c. 64H, § 6 (*r*) and (*s*), as well as G. L. c. 64I, § 7 (*b*), but that Onex was not entitled to a use tax exemption since it did not qualify as either a research and development (R & D) corporation or a manufacturing corporation under the statute.[5] The commissioner issued a notice of failure to file for the period from August 1, 1999, through September 30,

---

[4] A "beta" customer is one whose use of the chip is considered the last step in testing the product before a formal commercial roll-out.

[5] For purposes of the use tax, either a research and development (R & D) corporation or a manufacturing corporation would have been entitled to the

2001. Onex did not pay the use tax in question, and in December, 2002, the commissioner issued a notice of intent to assess. A notice of assessment for tax, interest, and penalties in the amount of $179,838.54 was issued in July, 2003.

Onex filed an application for abatement of use tax in July, 2003, seeking abatement of the entire amount assessed. The commissioner denied the application, and Onex filed a petition under formal procedure, see G. L. c. 58, § 2, with the board. A hearing was held at which three witnesses testified for Onex; the commissioner presented no witnesses. The hearing officer found that Onex's witnesses were "credible, consistent, and probative." The board adopted this determination and concluded that Onex was entitled to an abatement because it had been engaged in manufacturing during the relevant period[6] and the purchases qualified for exemption from use tax. The commissioner appealed to the Appeals Court. The Appeals Court affirmed the board's decision, see *Onex Communications Corp. v. Commissioner of Revenue*, 74 Mass. App. Ct. 643 (2009), and we allowed the commissioner's petition for further appellate review.

2. *Discussion.* Purchases of personal property are generally subject to sales tax under G. L. c. 64H, § 2, or use tax under G. L. c. 64I, § 2, at the time the sale is made. See G. L. c. 64H, § 5; G. L. c. 64I, § 6. Taxpayers engaged in R & D or manufacturing,[7] however, may be exempt from payment of use tax for materials, tools, fuel, machinery, and replacement parts that are

same exemption. See G. L. c. 64H, § 6 (*r*), (*s*); G. L. c. 64I, § 7 (*b*). A manufacturing corporation may be entitled also to other exemptions, not at issue here, for which an R & D corporation would not qualify. See, e.g., G. L. c. 59, § 5; G. L. c. 63, § 31A. A corporation engaged in R & D but without adequate R & D receipts under G. L. c. 63, § 42B, and 830 Code Mass. Regs. § 64H.6.4(4) (2007), might not qualify for the R & D exemption.

[6] The board declined to decide whether Onex was also an R & D corporation during the audit period. As stated, see note 5, *supra*, both R & D corporations and manufacturing corporations are entitled to the use tax exemption. Therefore, once the board concluded that Onex was a manufacturing corporation during the audit period, for purposes of the purchases at issue here, it was irrelevant whether Onex was also an R & D corporation during that time.

[7] A taxpayer may be both a manufacturing corporation and an R & D corporation. See *The First Years, Inc. v. Commissioner of Revenue*, 33 Mass. App. Tax Bd. Rep. 208, 213 (2007); *Duracell, Inc. v. Commissioner of Revenue*, 33 Mass. App. Tax Bd. Rep. 166, 172-173 (2007).

used "directly and exclusively" in R & D and manufacturing. See G. L. c. 63, §§ 38C, 42B;[8] G. L. c. 64H, §§ 6 (*r*) & (*s*), 7; G. L. c. 64I, § 7 (*b*). With limited exceptions, the exemptions for use tax, see G. L. c. 64I, § 7 (*b*), are the same as those for sales tax; the provision setting forth the use tax exemptions refers to and incorporates the statutory exemptions for sales tax. See *id.* ("The tax imposed by this chapter shall not apply to: . . . [*b*] Sales exempt from the taxes imposed under chapter sixty-four H [with certain exceptions for motor vehicles, boats, and airplanes] . . ."). General Laws c. 64H, § 6 (*r*), exempts from use tax tools and materials that are consumed during the manufacturing process. Section 6 (*s*) exempts machinery and tools that serve an integral and essential part in the manufacture, conversion, or processing of tangible personal property to be sold.

Onex asserts that it was exempt from use tax for purchases made during the period from August 1, 1999, through September 21, 2001, because it was "engaged in manufacturing." The commissioner argues that Onex did not manufacture any production-quality chips during this period, and that, when it made the purchases at issue, Onex was engaged only in R & D and the production of prototypes. The commissioner maintains that an intent to manufacture does not suffice. She contends that, to be engaged in manufacturing, a company must have produced at least one finished product, or the company's inputs must have "resulted in the fabrication of a finished product by some other entity," and contends that Onex did not make any marketable chips during the audit period.

a. *Standard of review.* "We review questions of statutory interpretation de novo, . . . giving 'substantial deference to a reasonable interpretation of a statute by the administrative agency charged with its administration enforcement.' " *Attorney Gen.* v. *Commissioner of Ins.,* 450 Mass. 311, 319 (2008), quoting *Com-*

---

[8]At all times relevant to this appeal, G. L. c. 63, § 38C, applied to domestic corporations and G. L. c. 63, § 42B, contained the same provisions for foreign corporations. Effective July 3, 2008, G. L. c. 63, § 38C, was repealed, and G. L. c. 63, § 42B, now applies to both domestic and foreign corporations. See St. 2008, c. 173, § 66; St. 2003, c. 141, § 29. In discussing G. L. c. 63, § 42B, we refer to the provisions in effect during the pertinent period from August, 1999, through September, 2001. The relevant language in the two versions of the statute is the same.

*merce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006). Because the board is authorized to interpret and administer the tax statutes, its decisions are entitled to deference. See *Bell Atl. Mobile of Mass. Corp.* v. *Commissioner of Revenue*, 451 Mass. 280, 283 (2008). Ultimately, however, the interpretation of a statute is a matter for the courts. See *Duarte* v. *Commissioner of Revenue*, 451 Mass. 399, 411 (2008) (deference is not abdication).

b. *Statutory use tax exemptions.* The board concluded that, pursuant to G. L. c. 64H, § 6 (*r*) and (*s*), and G. L. c. 64I, § 7 (*b*), Onex was exempt from use tax for the period from August 1, 1999, through September 21, 2001, because it was engaged in manufacturing; Onex asserts that the board's conclusion was correct.

To be a "manufacturing corporation," a company must be "engaged in manufacturing." See G. L. c. 58, § 2; G. L. c. 63, § 42B. Since this statutory language is "less than illuminating," see *Commissioner of Revenue* v. *Houghton Mifflin Co.*, 423 Mass. 42, 44 (1996), quoting *William F. Sullivan & Co.* v. *Commissioner of Revenue*, 413 Mass. 576, 579 (1992), the definition of a manufacturing company has been developed through decades of case law. See *Commissioner of Revenue* v. *Houghton Mifflin Co.*, *supra*; *William F. Sullivan & Co.* v. *Commissioner of Revenue*, *supra* at 581; *Joseph T. Rossi Corp.* v. *State Tax Comm'n*, 369 Mass. 178, 179-180 (1975); *Boston & Me. R.R.* v. *Billerica*, 262 Mass. 439, 444-445 (1928). Manufacturing has been defined as "change wrought through the application of forces directed by the human mind, which results in the transformation of some pre-existing substance or element into something different, with a new name, nature or use."[9] *Boston & Me. R.R.* v. *Billerica*, *supra*.

Under our traditional test, to qualify as a manufacturing company, a company's activities must be an "essential and integral" part in the manufacturing process. See *Joseph T. Rossi Corp.* v.

---

[9] In her regulations interpreting the qualifications necessary to be deemed a manufacturing company, the commissioner has further defined manufacturing as "the process of substantially transforming raw or finished materials by hand or machinery, and through human skill and knowledge, into a product possessing a new name, nature and adapted to a new use." See 830 Code Mass. Regs. § 58.2.1(6)(b) (1999).

*State Tax Comm'n, supra* at 181-182. We have construed the phrase "engaged in manufacturing" as having a flexible meaning that should not be narrowly restricted. See *William F. Sullivan & Co.* v. *Commissioner of Revenue, supra* at 579; *Commissioner of Corps. & Taxation* v. *Assessors of Boston*, 324 Mass. 32, 36 (1949).

c. *Proposed "finished product" test.* The commissioner maintains that Onex was not engaged in manufacturing when it made the purchases at issue, because, at that point, Onex had not yet produced a final version of the OMNI chip, and that, to be engaged in manufacturing, a company must have produced at least one finished product.[10] The commissioner's contention that to be engaged in manufacturing requires a company to have built and distributed a finished product is not consistent with established case law, recent positions taken by the commissioner, and the statutory purpose. We agree with the board that the proper test for determining whether a company is engaged in manufacturing continues to be whether the company was engaged in an "essential and integral" step in the manufacturing process.

In support of her argument that, to be engaged in manufacturing, a company must have manufactured at least one finished product, the commissioner relies heavily on *Commissioner of Revenue* v. *Houghton Mifflin Co., supra* at 47. In that case, the company, a book publisher, developed computer discs and tapes containing text, graphics, and layout information that were designed to be distributed to third parties who would use the discs to print and bind new books or to create marketable CD-ROM tapes. *Id.* at 44. Observing that the company "transform[ed] ideas, art, information, and photographs, by application of human knowledge, intelligence, and skill, into computer dis[cs]," *id.* at 48, we held that creation of the computer discs was sufficient to establish that the company was engaged in manufacturing. *Id.* at 49-50. We stated also that "[w]e have never required that source materials be tangible." *Id.* at 48.

Although, as the commissioner asserts, the company in that

---

[10]The commissioner contends that the small volume of OMNI chips produced by Onex during the audit period were prototypes or samples and were not produced in quantities sufficient to indicate that Onex was manufacturing a final product.

case was also producing other books while it was manufacturing the computer discs, those books were not material to the determination that the company was engaged in manufacturing. The creation of the computer discs alone was sufficient because the discs were an integral step in the manufacturing process. *Id.* at 49-50. See *Commissioner of Revenue* v. *Fashion Affiliates, Inc.*, 387 Mass. 543, 545-546 (1982) (although established company also produced dresses, because dress markers played integral role in cutting cloth for producing finished dress, making markers was itself manufacturing, even though markers were destroyed during cutting process).

In this case, unlike the circumstances in *Commissioner of Revenue* v. *Houghton Mifflin Co., supra*, and *Commissioner of Revenue* v. *Fashion Affiliates, Inc., supra*, we are faced with a start-up company that had not previously produced any finished product, and that produced only limited quantities of the OMNI chip before the end of the audit period. Nonetheless, we conclude that this is a distinction without a difference. Notwithstanding the commissioner's argument that Onex had produced only prototypes, the board held, consistent with the record, that during the audit period Onex had moved beyond production of prototypes and was making production chips that had been sold to a third-party client and marketed to other potential clients.

The commissioner and her predecessors have asserted on a number of prior occasions some form of the argument she makes here concerning the necessity of a finished, marketable product. See, e.g., *William F. Sullivan & Co.* v. *Commissioner of Revenue, supra* at 579-581. See also *Boston & Me. R.R.* v. *Billerica, supra* at 444-446 (railroad fabricating parts for use in repair of its own equipment was engaged in manufacturing). Our decisions in earlier cases, however, have not adopted this interpretation of the statute. We have held consistently that to be engaged in manufacturing, it is not necessary that a company produce a finished product. See *William F. Sullivan & Co.* v. *Commissioner of Revenue, supra* at 579-580, quoting *Joseph T. Rossi Corp.* v. *State Tax Comm'n, supra* at 181-182 ("processes which themselves do not produce a finished product for the ultimate consumer should still be deemed 'manufacturing' . . . so long as they constitute an essential and integral part of a total manufacturing process").

Thus, when a company performs some type of transformative process on raw materials, we have concluded that the company was engaged in manufacturing. See *William F. Sullivan & Co.* v. *Commissioner of Revenue, supra* at 577, 579-580 (company purchased scrap metal from other businesses, cut metal into specified lengths or formed it into cubes, and sold it to steel mills and foundries); *Joseph T. Rossi Corp.* v. *State Tax Comm'n, supra* at 182 (company cut down raw timber and, with specialized machinery and the "application of human skill and knowledge," made cut lumber of particular sizes, producing "new product, different in character and more useful and marketable than the raw material"); *Assessors of Boston* v. *Commissioner of Corps. & Taxation,* 323 Mass. 730, 736-737 (1949) (company performed wool scouring of raw wool that is essential and integral part of manufacture of textiles). Similarly, we have held that a company may be engaged in manufacturing where the company produces no final product itself, but generates blueprints or plans that are sent to third parties for ultimate production. See *Commissioner of Revenue* v. *Houghton Mifflin Co., supra* at 48-50. We have concluded also that a company may be engaged in manufacturing where the item never will be sold on the open market, but is designed to be used and consumed by the company in the production of other products. See *Commissioner of Revenue* v. *Fashion Affiliates, Inc., supra* at 546; *Courier Citizen Co.* v. *Commissioner of Corps. & Taxation,* 358 Mass. 563, 567, 571-573 (1971) (printing plates that are made and discarded after each press run "are made as the necessary first stage of a long process, culminating in a specifically ordered finished printed product," and therefore materials to manufacture plates, which are never sold to third parties, are exempt from use tax).

Notwithstanding the commissioner's arguments in this case, in other recent cases, the board and the commissioner have concluded that a company is engaged in manufacturing in circumstances that are inconsistent with the finished product test. See *The First Years, Inc.* v. *Commissioner of Revenue,* 33 Mass. App. Tax Bd. Rep. 208, 214 (2007) (creation of computer-aided designs for child-care products, building of models, and development of specifications for molds produced by third parties and

returned to company for testing, then transmitted to plants in other countries for production); *Duracell, Inc.* v. *Commissioner of Revenue*, 33 Mass. App. Tax Bd. Rep. 166, 172-173 (2007) (research and development of methods to improve batteries made in company's other plants, where such research was incorporated into new products, and testing of existing products to ensure adequate performance constituted manufacturing). See also Technical Information Release 08-2 (February 1, 2008), 1 Official MassTax Guide at 229 (West 2010) (commissioner adopts and will apply in future cases holdings of *Duracell* and *The First Years* on question of manufacturing); Letter Ruling 05-05 (June 7, 2005) (computer-aided design of network host bus adaptors and embedded storage switches, transmitted electronically to plants elsewhere in United States and other countries for production, was manufacturing).

Moreover, the commissioner's argument that, to be engaged in manufacturing, a company must have produced at least one finished product is contrary to the statutory purpose of encouraging new manufacturing industries to locate in Massachusetts and encouraging existing companies to develop and expand within the Commonwealth. See *Commissioner of Revenue* v. *Houghton Mifflin Co.*, *supra* at 46-47. Indeed, such a policy, which would place new companies in a disadvantageous tax position compared to existing companies, would tend to discourage the location of start-up companies in Massachusetts. In addition, imposing a finished product rule would allow the commissioner to set audit periods arbitrarily so that the period reviewed could exclude, even by one day, the time at which the final product was distributed and sold. Such arbitrary enforcement periods would create the possibility of abuse of discretion and unequal treatment of individual taxpayers. Cf. *Courier Citizen Co.* v. *Commissioner of Corps. & Taxation*, *supra* at 567, 571-572 (statute authorizing use tax exemption "should not be construed to require the division into theoretically distinct stages of what is in fact continuous and indivisible"). Many high-technology items, such as the one at issue here, may require years of effort to create a market-ready product.

The commissioner claims that it will be impossible to administer the statute if no final product rule is required; that the board's

holding to the contrary eviscerates the distinction between R & D and manufacturing companies; and that the holding will generate uncertainty as to the timing of manufacturing exemptions. These arguments are unavailing. Our existing interpretation of the statute has been in place and administered without significant difficulty for many years; during that time, a determination whether a company is engaged in manufacturing has not been based on a final product theory.

The commissioner argues also that, without a final product rule, it will be difficult or impossible to administer the manufacturing company exemption for local property taxes. She makes this argument based on her assertion that Onex was engaged in manufacturing only subsequent to, not during, the audit period, and asserts that a determination of eligibility for the property tax exemption cannot depend on a prediction of future events. As stated, the assertion that Onex was engaged in manufacturing only after the audit period is inaccurate. The requirement of a local property tax exemption for manufacturing companies is governed by a separate statute that requires the taxpayer to make specific application for a particular tax year. See G. L. c. 59, § 5. Consistent with that statute, the taxpayer must demonstrate that it is engaged in manufacturing, i.e., an essential step in the manufacturing process, during the tax year at issue. Such a demonstration will necessarily require a showing of the company's current activities. We discern no administrative difficulty.

Finally, the commissioner argues that 830 Code Mass. Regs. § 58.2.1(6)(b)(5) (1999) ("research and development, and design and creation of a prototype, although prerequisites to manufacturing, are not manufacturing") precludes a finding that Onex was engaged in manufacturing. This argument is contrary to the board's finding, supported by the record, that Onex was producing more than prototypes, and does not take into account the provisions of 830 Code Mass. Regs. § 58.2.1(6)(b)(7) (process that is "practical and necessary step in the production of a finished product for sale" is generally considered essential and integral part of manufacturing process). The board held correctly that § 58.2.1(6)(b)(7) was applicable here; its holding is consistent with our case law and legislative intent.

d. *Abatement as manufacturing corporation.* Having decided the question of the test to be applied, we turn to the issue whether Onex was entitled to its requested abatement as a manufacturing corporation. A determination whether a particular company is engaged in manufacturing is a fact-based inquiry. See *William F. Sullivan & Co. v. Commissioner of Revenue,* 413 Mass. 576, 581 (1992) ("undefinable nature of the operative terms in these exemption cases necessitates case-by-case, analogical development of their meaning"). The board made factual findings and determined that, at the time it made the purchases at issue, Onex was a manufacturing corporation pursuant to G. L. c. 63, § 42B. The board concluded that Onex was founded to take a "new product from abstract concept to production" and that it had been engaged in manufacturing during the audit period. The record supports the board's findings.

As evident from Onex's audited financial statements, business plans, and initial funding, the production, distribution, and enhancement of the OMNI chip was Onex's sole purpose. Onex was incorporated at the point at which design of the OMNI chip had been completed and patent applications for the design had been filed. At that time, the OMNI chip was a revolutionary device far more advanced than any other device available to the telecommunications industry. The technical specifications for its design were included in product brochures, a "data sheet," and a user manual developed during the summer of 1999 before the purchases for which Onex claimed use tax exemptions.

Pursuant to business plans created prior to any of the purchases at issue, Onex obtained venture capital funding to bring the OMNI chip to market. In all, Onex received three rounds of venture capital funding in 1999 and 2000, totaling $30 million, for development, manufacture, and sale of the OMNI chip. The $20 million from the third round of funding was received because of Onex's progress in developing the OMNI chip.

Furthermore, Onex entered into several contracts involving creation and distribution of the OMNI chip prior to and during the audit period. As stated, in September, 1999, prior to the first purchase at issue, Onex executed a contract with Transwitch to market and distribute the chip. In 2000, Onex contracted with IBM to produce the chip at IBM's facilities, and in September, 2000, Onex executed agreements with its first customer, Polaris.

Polaris's licensing agreement as a "beta" customer provided for a reduced per chip price in return for final testing of the production chips prior to full-scale production. IBM began producing OMNI chips on July 1, 2000. In early 2001, IBM produced fifty to one hundred production-quality chips, which were tested and analyzed by Onex. After testing, Onex modified the computer-aided "blueprint" and sent the amended specifications to IBM for subsequent production by mid-2001. This process of testing and improving the product design is similar to the processes followed for the development of infant products in *The First Years, Inc.* v. *Commissioner of Revenue*, 33 Mass. App. Tax Bd. Rep. 208, 214 (2007), and the development of improved batteries in *Duracell, Inc.* v. *Commissioner of Revenue*, 33 Mass. App. Tax Bd. Rep. 166, 172-173 (2007). During the same period, Onex sold small numbers of chips to Polaris as a "beta" customer, which the board determined was "the last step in testing the product before a formal commercial roll-out."

The board concluded correctly that creation of the "blueprint" for release to IBM was an essential and integral step in the manufacture of the OMNI chip. Although the OMNI chip was to be produced by means of the third-party contract with IBM, production of the chip was entirely dependent on the "blueprint," and IBM was required to follow precisely the computer-aided design encoded in the "blueprint." Development of the "blueprint" for production of the OMNI chip by IBM is virtually identical to the development of the compact discs containing the information for creating the physical books in *Commissioner of Revenue* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43-44, 48 (1996). Creation of the first fifty to one hundred production chips in early 2001, and refinement of the "blueprint" and the manufacturing process after analysis of the chips' quality, were also essential and integral steps in testing the new chip before full-scale production, as was its use by Polaris, the "beta" customer. See *Duracell, Inc.* v. *Commissioner of Revenue*, *supra*.

To be entitled to the exemption as a manufacturing corporation, Onex must demonstrate also that manufacturing was a "substantial" portion of its business during the relevant period. See *RCN-BecoCom, LLC* v. *Commissioner of Revenue*, 443 Mass. 198, 202 (2005). The distribution of Onex's employees, office space and equipment, budget, and expenses supports the

board's conclusion that Onex was engaged in manufacturing the OMNI chip and that such manufacturing was a substantial portion of its business. Ninety per cent of its employees and seventy-five per cent of its floor space were dedicated to development of the "blueprint" for the OMNI chip. Approximately ninety-five per cent of Onex's computer hardware and software was used in creating the "blueprint" for production of the OMNI chip.

The audit period ended in September, 2001, at the point at which Onex was acquired by Transwitch. A few months later, in early 2002, Onex began larger-scale production of the chip. The time period of this audit demonstrates the difficulties, discussed *supra*, inherent in the arbitrary setting of audit periods so that the period reviewed may not be "coextensive" with final production. For high technology products such as the one involved here, production of an acceptable quality product may require, as it did in this case, several years of effort to complete the manufacturing process.

The commissioner contends that the board's holding is based improperly on the "possibility of the occurrence of future events." See *Northgate Constr. Co.* v. *State Tax Comm'n*, 377 Mass. 205, 208 (1979). The commissioner's argument that the board determined incorrectly that Onex was entitled to a use tax exemption for manufacturing that took place at a later period is without merit. As stated, the board found that, throughout the audit period, Onex was engaged in creation of the "blueprint," an essential and integral step in the manufacturing process, and also that Onex produced limited quantities of a finished product.

e. *Abatement as R & D corporation.* Onex sought also to obtain abatement of use taxes as an R & D corporation. Relying on the "receipts" test, Onex argues that its initial venture capital funding, as well as income from "barter" exchanges, constituted "receipts."[11] The board did not make any finding whether Onex was also an R & D corporation during this period. Onex cross-

---

[11]At the time at issue, an R & D corporation was defined as one whose principal activity was R & D and which "derive[d] more than two thirds of its receipts assignable to the [C]ommonwealth from such activity and which derive[d] more than one third of its receipts assignable to the [C]ommonwealth from the research and development of tangible personal property capable of being manufactured in this [C]ommonwealth." See G. L. c. 63, § 42B, as appearing in St. 1970, c. 534, § 25.

appealed on the ground that it qualified as an R & D corporation. Because of our conclusion that Onex was engaged in manufacturing during the relevant period and was therefore entitled to the abatement it sought, we need not determine whether Onex was also an R & D corporation as defined in G. L. c. 63, § 42B, entitled to the same abatement during that period.

*Decision of the Appellate Tax Board affirmed.*