# Willowdale LLC *vs.* Board of Assessors of Topsfield.

No. 10-P-605.

Suffolk. January 3, 2011. - February 16, 2011.

Present: Grasso, Trainor, & Milkey, JJ.

*Taxation,* Real estate tax: abatement, exemption.

The Appellate Tax Board (board) correctly affirmed the decision of a town board of assessors denying the taxpayer's application for an abatement of real estate taxes on a mansion and surrounding land located in a State park, leased to the taxpayer for for-profit use through the historic curatorship program, under the exemption provided by G. L. c. 59, § 2B, where the taxpayer's use of the mansion was neither reasonably necessary to the public purpose of the park nor one that was available to the use of the general public, and where, given the lack of an express exemption, exemption from taxation could not be inferred from the legislative purposes of the historic curatorship program; further, the board did not err in declining to defer to an opinion stated by the predecessor of the Department of Conservation and Recreation in a letter that the taxpayer's use of the mansion was reasonably necessary to the public purpose of the park. [769-772] Milkey, J., concurring.

Appeal from a decision of the Appellate Tax Board.

*Kevin J. Joyce* for the plaintiff.

*Jeffrey T. Blake* for the defendant.

Grasso, J. Willowdale LLC appeals from a decision of the Appellate Tax Board (board) concluding that it is not entitled to an exemption from real estate taxes pursuant to G. L. c. 59, § 2B, for its use and operation of the Palmer Mansion (mansion), located within the Bradley Palmer State Park (park), for certain for-profit enterprises. The board denied Willowdale the exemption because it concluded that Willowdale's use and operation of the mansion was not reasonably necessary for the public purpose of the park.[1] We affirm.

---

[1]The board bifurcated Willowdale's appeals concerning the issues of exemption and valuation, deciding only the former.

*Background.* The parties submitted the case to the board on an agreed statement of facts in the nature of a case stated, see *Caissie* v. *Cambridge*, 317 Mass. 346, 347 (1944), and the pertinent facts are not in dispute. The park, located in Topsfield (town), consists of approximately 721 acres.[2] Located within the park is the mansion, an historic property. In 1999, the Department of Conservation and Recreation (DCR)[3] leased the mansion and approximately six surrounding acres of the park to Willowdale under authority granted by the historic curatorship program, which was established to preserve unused, historically significant properties through a public-private partnership.[4] See St. 1994, c. 85, § 44, as amended by St. 1996, c. 15, § 50. The lease authorizes Willowdale to operate the mansion as a bed and breakfast and for other specified for-profit purposes and renders Willowdale responsible for the reuse and rehabilitation of the mansion. Willowdale bears sole responsibility for any costs of restoring the mansion, but any expenditures for that purpose are credited against its rent payments to the Commonwealth. The lease explicitly obligates Willowdale to pay any real estate taxes levied upon the leased premises.

After completing the necessary rehabilitation, Willowdale opened the mansion as a bed and breakfast and a venue for weddings and private events, charging $3,000 to $6,500 for a five-hour wedding and $2,000 to $3,000 for other three-hour events.[5]

___

[2] See Department of Conservation and Recreation, Bradley Palmer State Park, http://www.mass.gov/dcr/parks/northeast/brad.htm (last visited Jan. 31, 2011).

[3] The Department of Conservation and Recreation is the legal successor to the Department of Environmental Management (DEM), which was originally authorized to enter into leases such as that with Willowdale.

[4] The purpose of the historic curatorship program, as stated in the enabling act, is to lessen the burden on government to pay for expenses incurred in preserving and maintaining historic properties for the benefit of the general public by leasing them to private curators. Under the curatorship program, DCR partners with a curator who agrees to rehabilitate, manage, and maintain an historic property in return for a long-term lease. As a result, DCR secures the long-term preservation of threatened historic sites, and curators exchange their hard work and unique skills for the opportunity to live in or work on a one-of-a-kind property.

[5] Under the lease, Willowdale also agreed to make "reasonable efforts" to establish public programs with DCR, as long as such programs do not "materially interfere" with Willowdale's for-profit use. In consequence, at limited times, Willowdale grants free access to the mansion for community events and public tours.

In 2007 and 2008, the board of assessors of the town assessed Willowdale real estate taxes of $16,275.52 and $15,908.47, respectively, pursuant to G. L. c. 59, § 2B. Willowdale timely paid the taxes and applied for an abatement. After the town denied the abatement, Willowdale appealed to the board. The board affirmed the denial, concluding that Willowdale had not satisfied its burden of establishing that its use of the mansion as a business conducted for profit was reasonably necessary to the public purpose of a park.

*Discussion.* General Laws c. 59, § 2B, as appearing in St. 1980, c. 261, § 13, permits "real estate owned in fee . . . [by] the commonwealth . . . if used in connection with a business conducted for profit or leased or occupied for other than public purposes" to be taxed. Willowdale does not dispute that the mansion and surrounding real estate is "used in connection with a business conducted for profit" within the meaning of § 2B. Willowdale contends, however, that it falls within the exemption from taxability set forth in the provision of § 2B, third par., inserted by St. 1979, c. 797, § 11, which states that "[t]his section shall not apply to a use, lease or occupancy which is reasonably necessary to the public purpose of a . . . park, which is available to the use of the general public." We disagree.

"Exemption from taxation is a matter of special favor or grace. It will be recognized only where the property falls clearly and unmistakably within the express words of a legislative command." *New England Legal Foundation* v. *Boston*, 423 Mass. 602, 609 (1996), quoting from *Massachusetts Med. Soc.* v. *Assessors of Boston*, 340 Mass. 327, 331 (1960). As the party seeking exemption, Willowdale bears the burden of establishing its entitlement. See *AA Transp. Co.* v. *Commissioner of Rev.*, 454 Mass. 114, 121 (2009). Willowdale failed in meeting this burden. Nothing in the provisions of G. L. c. 59, § 2B, or in the legislation establishing the historic curatorship program provides for the exemption from real estate taxation that Willowdale seeks. See *Gloucester Ice & Cold Storage Co.* v. *Assessors of Gloucester*, 337 Mass. 23, 27 (1958) ("It is for the Legislature to decide to what extent it will assist the execution of a public purpose").

In relying on G. L. c. 59, § 2B, as the basis for its exemption,

Willowdale confuses what is reasonably necessary to the maintenance and use of the mansion as an historic property with what is reasonably necessary to the public purpose of a park available to the use of the general public. While Willowdale's for-profit use of the mansion may be reasonably necessary to fund the rehabilitation and maintenance of the mansion under the curatorship program, and may explain Willowdale's incentive to participate, that use is not reasonably necessary for the public purpose of the park or for the park to be available to the use of the general public.

For an exemption from real estate taxation to apply, G. L. c. 59A, § 2B, requires not only that the for-profit use be "reasonably necessary to the public purpose of a . . . park" but also that the park be one "which is available to the use of the general public." Willowdale's use of the mansion satisfies neither of these prerequisites. First, Willowdale's use of the mansion is not reasonably necessary to the public purpose of the park. The public's use of the environs of the park is in no way restricted by or dependent upon Willowdale's for-profit operation of the mansion as a bed and breakfast or event venue. The public is free to walk the park's trails and meadows and admire its ponds and natural beauty without regard to the presence of the mansion. See *Salem* v. *Attorney Gen.*, 344 Mass. 626, 630 (1962) (park is tract of land set apart for pleasure, exercise, amusement, ornament, recreation, or enjoyment of public at large). Compare *Miller* v. *Commissioner of Dept. of Envtl. Mgmt.*, 23 Mass. App. Ct. 968, 969 (1987) (control by agency of ski program run by private entity in State park demonstrated public purpose); *MMC Mgmt. Group, Inc.* v. *Assessors of New Bedford*, 26 Mass. App. Tax Bd. Rep. 239, 245-247 (2000) (control by agency of ice rink operated by private entity demonstrated public use).[6] Indeed,

---

[6]Unlike the situation in *Miller* v. *Commissioner of Dept. of Envtl. Mgmt.*, *supra*, and in *MMC Mgmt. Group, Inc.* v. *Assessors of New Bedford*, *supra*, where the degree of control retained by the agency over the private enterprise demonstrated that the use was reasonably necessary to the public purpose of a park, Willowdale's operation of the mansion is not controlled in any material respect by DCR. DCR has no control over the mansion's hours of operation, the fees it charges the public, or the type of events that may be scheduled, and it does not keep keys to the mansion, inspect the premises, or share a percentage of its gross revenues. See *MMC Mgmt. Group, Inc.* v. *Assessors of New Bedford*, *supra*.

it is undisputed that the public may access and use all other areas of the park independently of the mansion. See *Smith* v. *Assessors of Fitchburg*, 34 Mass. App. Tax Bd. Rep. 52, 55-56 (2008) (private ownership of airport hangars not reasonably necessary to public's use of airport because airport could serve public without hangars).

Moreover, Willowdale's use of the mansion is not as a park "available to the use of the general public." Although the park itself is available to the use of the general public, the mansion's availability is limited first and foremost to those willing to pay the charges associated with its for-profit use as a bed and breakfast or event venue. Put differently, the mansion's primary availability is not to the use of the general public, but to the use of its private customers.[7] Indeed, the general public has little more access to the mansion than it has to any private business. In sum, Willowdale is not entitled to an exemption from real estate taxes under G. L. c. 59, § 2B, because its use of the mansion is neither reasonably necessary to the public purpose of the park nor one that is available to the use of the general public.

We reject Willowdale's suggestion that exemption from taxation may be inferred from the legislative purposes of the historic curatorship program. The determination that preserving historic landmarks serves a public good does not carry with it the corresponding determination that a tax exemption applies. The governing legislation did not provide, as it could have, express exemption from real estate taxes for all historic properties associated with the curatorship program. Compare *Cabot* v. *Assessors of Boston*, 335 Mass. 53, 56 (1956) (statute authorizing city to contract with private corporation for construction and operation of garage under Boston Common provided express exemption from taxation). The absence of such an express exemption signifies that such properties are not to be deemed tax

---

[7]Willowdale does not argue, nor does the record support, that its lease obligation to make "reasonable efforts" to establish public programs with DCR opens the mansion to the general public to such an extent that it must be considered "open to the general public." We need not address the extent to which such a different circumstance would alter the conclusion.

Here there is no dispute that the mansion is used, primarily and substantially, as a business conducted for a profit and that any use of the mansion for public programs is entirely subsidiary and must not "materially interfere" with the for-profit use.

exempt merely because the curatorship program itself serves a public good. See *Atlantic Refining Co.* v. *Assessors of Newton*, 342 Mass. 200, 204-205 (1961) (failure to include express provision for tax exemption leaves entity open to taxation). By omitting such an express exemption, the Legislature confined the tax exemption available to curatorship properties to those that meet the requirements of G. L. c. 59, § 2B.

Finally, we reject Willowdale's contention that the board erred in not giving deference to a 2001 letter from DEM (now DCR) opining that Willowdale's use of the mansion under the historic curatorship program was reasonably necessary to the public purpose of a park so as to qualify for tax exemption pursuant to G. L. c. 59, § 2B. Even were we to assume that the letter from DEM, which was not referenced in the agreed statement of facts, was properly before the board, we discern no error in the board's declining to defer to DEM's stated position regarding the taxability of the mansion property. Although DEM (now DCR) has considerable expertise in the management of park property, its expertise does not encompass interpretation of the tax laws. See *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 633 (2005) (deference given to expertise and statutory interpretation of agency charged with administrating the statute). Because the Department of Revenue, and by extension the board, is responsible for the administration of § 2B, it need not defer to DCR in its interpretation regarding taxability. See *AA Transp. Co.* v. *Commissioner of Rev.*, 454 Mass. at 118-119; *Onex Communications Corp.* v. *Commissioner of Rev.*, 457 Mass. 419, 423-424 (2010).

The board did not err in concluding that Willowdale failed to meet its burden of establishing that its use of the mansion as a for-profit enterprise is "reasonably necessary to the public purpose of a . . . park, which is available to the use of the general public" so as to entitle it to exemption from taxation pursuant to G. L. c. 59, § 2B.[8]

*Decision of the Appellate Tax
Board affirmed.*

---

[8]Willowdale's belated contention that imposition of real estate taxes on the subject property constitutes a confiscation of a property and a violation of due

MILKEY, J. (concurring) Because the Appellate Tax Board (board) gave the statute a reasonable interpretation, I agree with the majority that the board's decision should be affirmed. See *Provencal* v. *Commonwealth Health Ins. Connector Authy.*, 456 Mass. 506, 514 (2010) ("substantial deference" owed to agency's interpretation of statute it administers). I write separately to make two limited points. The first has to do with those aspects of the majority's opinion that suggest a bright-line distinction between the historic building at issue (Palmer Mansion) and its surrounding parkland. In my view, drawing such a distinction is not warranted. Notwithstanding its relatively small footprint, Palmer Mansion appears to be an integral component of Bradley Palmer State Park (park). Indeed, the park originated as a private estate. At least to a limited extent, the public can no doubt enjoy the historic and architectural attributes of Palmer Mansion (which Willowdale indisputably played a critical role in preserving) without ever entering its interior.

I also take issue with the majority's conclusion that no deference is owed to the State park agencies. Although the Department of Environmental Management (DEM) (and its successor the Department of Conservation and Recreation [DCR]) may not be owed deference on matters of taxation, they presumably are owed some deference on subsidiary issues that involve the administration and use of State parks. In its 2001 opinion letter, DEM did not merely state its view that its lessee should not be taxed. Rather, the agency specifically concluded that Willowdale's "use is reasonably necessary to the public purpose of the park," and it explained at some length how it came to that conclusion. The board upheld the town's decision without coming to grips with, or even mentioning, DEM's views on this issue (the determinative issue in the case). I find this omission disquieting. I am ultimately comfortable with affirming the board's decision notwithstanding this omission only because of how the issues developed over the course of the proceedings.[1]

process of law requires no discussion. The claim was not raised below, see *Analogic Corp.* v. *Assessors of Peabody*, 45 Mass. App. Ct. 605, 608-609 (1998), and need not be addressed here. Moreover, Willowdale's conclusory assertion does not rise to the level of adequate appellate argument required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Tynan* v. *Attorney Gen.*, 453 Mass. 1005 (2009).

[1] As the majority notes, it is not at all clear that the DEM letter was properly

before the board since Willowdale merely had attached the letter to its administrative brief. In addition, DCR has demonstrated little interest in pressing the position that its predecessor held. Notably, DCR did not make any amicus submission to the board or this court. When Willowdale's counsel was asked at oral argument whether he could shed any light on DCR's absence, he replied that DCR had made it plain that Willowdale "had been told previously that we were on our own" in pressing the matter. The agency's unwillingness to stand behind its predecessor's letter undercuts the force of the position that Willowdale ascribes to it.